# Illinois Official Reports

## Appellate Court

<div style="border:1px solid black">

### *People v. Nevilles*, 2021 IL App (1st) 191388

</div>

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DERRICK NEVILLES, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>No. 1-19-1388 |
| Filed | November 5, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, Nos. 14-CR-7829, 14-CR-7830; the Hon. Carl B. Boyd, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Douglas R. Hoff, and Jennifer L. Bontrager, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Mary L. Boland, and Tasha-Marie Kelly, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE HARRIS delivered the judgment of the court, with opinion.<br>Justices Mikva and Oden Johnson concurred in the judgment and opinion. |

**OPINION**

¶ 1    Defendant, Derrick Nevilles, appeals his conviction, after a jury trial, of criminal sexual assault and aggravated criminal sexual abuse of T.B. and B.B. and his sentence of 27 years' imprisonment. On appeal, defendant contends (1) the State failed to prove him guilty of the crimes beyond a reasonable doubt where the testimony of T.B. and B.B. was vague, inconsistent, and contradictory and no evidence corroborated the testimony; (2) trial counsel provided ineffective assistance when they agreed to join T.B. and B.B.'s cases and the joinder prejudiced defendant; and (3) the trial judge erred in allowing the State to introduce irrelevant and inflammatory evidence regarding incidents that occurred after the offenses charged in this case. For the following reasons, we affirm.

¶ 2                                I. JURISDICTION

¶ 3    Defendant was sentenced on April 22, 2019. He filed a late notice of appeal, which this court allowed, on July 17, 2019. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013) and Rule 606 (eff. July 1, 2017), governing appeals from a final judgment of conviction in a criminal case entered below.

¶ 4                                II. BACKGROUND

¶ 5    In 2014, defendant was charged with multiple counts of criminal sexual assault and aggravated criminal sexual abuse of T.B. and B.B. that occurred while they were members of New Voices, a musical group. Defendant formed the group and was its manager. The indictments charged defendant for offenses against T.B. that occurred between December 27, 2003, to January 31, 2004; April 1, 2003, to December 26, 2005; and February 1, 2004, to December 26, 2005, when T.B. was under 18 years of age and defendant "held a position of trust, authority, or supervision in relation to T.B." as the manager of New Voices. Defendant was also charged with multiple counts regarding B.B. for offenses that occurred between May 1, 2003, to December 31, 2004, when B.B. was under 18 years of age and defendant "held a position of trust, authority, or supervision in relation to B.B." as the manager of New Voices.

¶ 6    Prior to trial, the State filed a motion to join T.B.'s and B.B.'s cases. Defense counsel did not object, stating, "having reviewed the law and the facts of the case, I don't believe there is a legal objection to joinder in this matter." The State also sought to admit evidence of other crimes pursuant to section 115-7.3 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7.3 (West 2018)). The State wanted to admit T.B.'s and B.B.'s testimonies in each other's cases and sought admission of testimony from A.I., another former member of New Voices. The trial court allowed the other-crimes evidence to show "motive, intent, knowledge, absence of mistake and *modus operandi*," as well as propensity.

¶ 7    Prior to trial, defense counsel filed a motion to bar testimony of Charron Davis that she observed defendant and T.B. engaging in sexual activity. Counsel argued that the State could not prove that the activity occurred when T.B. was under 18 years old. The trial court denied the motion, finding that defense counsel could cross-examine Davis "as to the time period" of the acts. Upon reconsideration, the trial court again denied the motion:

"The court believes that this is intrinsic evidence. [It's] [p]art of the allegations that's contained in the indictment[.] I don't feel that it's extrinsic to that and as such it should be admitted. It's just the nature of intrinsic evidence. It might be prejudicial to the defendant, but that is just the nature of the charge when it's intrinsic."

¶ 8  At trial, T.B. testified that she auditioned for New Voices when she was 15 years old. She was accepted as a member, and her mother signed a contract with defendant. At the time, the group consisted of T.B. and another girl named Tiffany. They rehearsed in an office space in Park Forest. A few months later, B.B., a girl from Tiffany's school, also joined the group. Shortly after B.B. became a member, the group began rehearsing in the living room of defendant's home in Park Forest. When the weather was nice, they rehearsed in the detached garage. Defendant would pick up T.B. and B.B. after school for rehearsals and then take them home. Defendant's "daughters had after school stuff, and his wife was at work" when they rehearsed during the week. Defendant wanted the girls to learn how to play instruments, and T.B. began studying piano. About a month later, Tiffany left New Voices and J.M. and D.B. joined the group.

¶ 9  T.B. testified that they rehearsed together but each member also "practiced separately, so it would be—if it was my day to practice, it was just [defendant] and I." For weekend rehearsals, the girls spent the night at defendant's house "because [defendant] was the one that was driving us and taking us back, so he suggested to our parents that we just stay the weekend. You know, he had a wife, kids, *** our parents felt like it would be okay." The group rehearsed every weekend. When they stayed overnight, T.B. and B.B. slept on couches in the living room because the house was small.

¶ 10  After T.B. joined New Voices, defendant started asking her questions about whether she had a boyfriend or was sexually active. He also asked her if she was a virgin, and T.B. responded that she was. T.B. answered the questions because she thought he was asking them to "see if she was serious about what she was doing" with New Voices. Defendant asked these questions frequently and discouraged T.B. from having a boyfriend.

¶ 11  The group "did some shows *** at the local McDonalds," and they planned to audition in California with record labels. T.B. testified that as they prepared for the auditions, defendant would tell her about a record executive in California named Pete and that "[T.B.] would be asked to have sex with him in order to land that record deal, even if [she] was talented that [she] would have to have sex with him." Defendant told her, "that's the way it works in the business." Defendant also told T.B. that because she was a virgin, she would need "to prepare to have sex" with Pete. Defendant said "he should be the one to do that." He brought up the idea of having sex with T.B. at almost every rehearsal. He would tell T.B. that her mother "didn't have much" and T.B. could change her life if the group became successful. T.B. agreed to "try it." These conversations occurred during T.B.'s individual practice sessions with defendant in the garage.

¶ 12  The first incident took place in defendant's garage. Defendant placed a comforter on the floor and told T.B. to undress. Defendant touched T.B.'s breasts and vagina and kissed her on her neck. Defendant then masturbated and told T.B. he was going to put his penis inside her. He told her not to cry and to "try to handle it," but T.B. "clenched up really bad." Defendant "then said that we would just pretty much do oral sex." He told T.B. that she "needed to learn oral sex and to perform oral sex on him." After that, almost every time T.B. went to defendant's

house to rehearse he performed oral sex on her and made her perform oral sex on him. He told her that they were "practicing to lead up to meeting Pete."

¶ 13 In the summer of 2004, New Voices traveled to California to audition for record labels. Defendant accompanied the group, as did D.B.'s mother, who went as a chaperone. Defendant stayed in one hotel room with T.B. and B.B., and D.B.'s mother stayed in another room with the other girls. T.B. testified that it was defendant's idea to have them share a room. While in their room, defendant asked B.B. to leave. He told T.B. that "he needed to work with [her] again," to have sex with her, in the room. Defendant performed oral sex on T.B., he had T.B. perform oral sex on him, and he masturbated in front of T.B. Defendant also tried to put his penis in T.B.'s vagina. At one point, defendant asked her to leave the room so he could be alone with B.B.

¶ 14 They spent two nights in California, and when they returned, there was "a big uproar" about the room arrangements, and J.M. and D.B. left the group. Defendant told T.B. that the label wanted to hear more from them but since only two members were left it would be "necessary" to have sex with Pete "to make the deal happen." Defendant told T.B. and B.B. to go to the garage and undress. He started kissing and touching the girls, and defendant had sex with B.B. in the presence of T.B. Defendant began to perform oral sex on T.B., but she was shocked by what was going on so he "stopped it quickly."

¶ 15 Defendant later took T.B. to the Deluxe Budget Motel where he had a video recorder set up in the room. He told T.B. to undress, and he took some pictures. He told her that he would send a recording to Pete "so that he would know what he would be getting." In the room, defendant and T.B. had "full vaginal sex" for the first time.

¶ 16 In October 2004, A.I. was brought in as a new member of the group, and B.B. left New Voices soon after. A.I. was only with the group for a few weeks before she left.

¶ 17 In December 2004, when T.B. was 17 years old, defendant took her to the home of Davis. He told T.B. that he wanted her to audition for a movie about exotic dancers. Davis told T.B. to take a bath and shave her private area. T.B. was given lingerie to wear. Defendant took pictures of T.B. and said that Davis would be having sex with Pete. He wanted them to practice, and he would send Pete the video. Defendant, Davis, and T.B. then engaged in sexual activity.

¶ 18 After New Voices dissolved, T.B. continued meeting with defendant because he told her he wanted to work with her after she turned 18 years old. Not long after, she moved in with defendant and his family. She continued having sex with defendant because she "wanted to continue music." She had been having sexual encounters with defendant since she was 15 years old, so she was "very use[d]" to it and did not "identify what was happening." She first became pregnant when she was a senior in high school. T.B. testified that defendant had her terminate her pregnancies.

¶ 19 T.B. stated that defendant's wife was often not home during the day, and she did not have conversations with her. She was closer to defendant's three daughters because they were around the same age. T.B. did not tell defendant's wife or his daughters what was happening because he told her to take that knowledge "to the grave." T.B. testified that, at the time, she did not see defendant as "the person inflicting the pain" because she thought "it was the industry and this Pete person that wanted it." T.B. stayed with defendant and his family for about a year and a half.

¶ 20 On cross-examination, T.B. stated that she could not recall the month or year of the threesome with B.B. in defendant's garage. She thought it occurred "as soon as she came back from California." She went to the police for the first time on December 23, 2010. T.B. testified that she told police about the encounter in the garage with B.B. but was not sure they included it in the report. After B.B. left the group, T.B. did not have contact with her until she reached out to B.B. via Facebook Messenger in 2010.

¶ 21 T.B. did not know what was going on between B.B. and defendant when they were with the group because defendant "alienated" them. Defendant would call each member separately to the garage, and when they returned, no one asked what was going on there. When they rehearsed in the living room, it was hard to hear what was happening in the garage because it was detached from the house. T.B. stated that, at Davis's house, defendant had sex with Davis and had oral sex with T.B.

¶ 22 Davis testified that in 2003 or 2004, she was in her early twenties when someone named Tim from Tri-Star Pictures contacted her. She identified defendant as "Tim." Defendant told Davis that she "needed to be sexual with him a certain number of times in order to get into the entertainment industry." She began a sexual relationship with defendant.

¶ 23 In July 2006, defendant brought T.B. to her home and asked that Davis "get her comfortable." Davis had never met T.B. before. She helped get T.B. into the bathroom for a bath, and she "gave her a razor to shave" her "vaginal area." Davis could not recall whether she gave T.B. lingerie to wear. Afterwards, they sat on her futon and T.B. began to sing. Davis remember T.B. singing "because she had a beautiful voice." Defendant wore a long white shirt, and he was "kneeling towards [T.B.], like almost to be giving *** oral sex to her." Davis could not recall whether she had sex with defendant that evening, but she did not think she did. Davis also could not recall whether she had sex with T.B. Davis stated that after the incident, she had no further contact with T.B.

¶ 24 B.B. testified that she auditioned for New Voices in the summer of 2004, when she was 13 years old. She was accepted and signed a contract with defendant as her manager. She stated that the first rehearsals took place in defendant's assistant's basement. Later, they rehearsed at defendant's home in Park Forest as well as at an office space he rented. At the time, T.B. and Tiffany were also in the group. They practiced almost every day. Defendant told B.B. that she could not be a cheerleader because she "couldn't do anything else except practice with the band." Defendant would pick her up, and he dropped her off after practice. On weekends, they would spend the night at his house.

¶ 25 Defendant had B.B. learn the bass guitar, and she had private sessions with him. During these sessions, she would tell defendant about how people teased her about her appearance. They said she "looked like a toothpick." During one of their conversations, defendant mentioned the possibility of "enhancement sessions." He told B.B. that he could play with her breasts "to make them grow." He said there was "a certain way [she] could sit on his penis and he could spread [her] hips to make those wider." Defendant told B.B. how T.B. "had breasts" and Tiffany "was very hippy." He said he could help B.B. and "what happens with the group is for the benefit of the group." B.B. "had the powerhouse voice *** but image is everything and [she] just didn't have the image." Although she was reluctant at first, B.B. agreed to the plan because she "wanted curves." Defendant told her that "it's not sex[,] we consider this enhancement."

- 5 -

¶ 26 During the enhancement sessions, defendant would place his penis in B.B.'s vagina and suck on her breasts. They began having vaginal sex "almost every day." They stopped having sex for a while when the group started practicing in the living room of defendant's house. One day defendant took B.B. to a hotel where he took pictures of her body. He told B.B. that she was starting to slim down and her hips were not as wide. As a result, they restarted the enhancement sessions in defendant's garage. B.B. testified that defendant would pull each girl out of rehearsals individually and take them to the garage "because he wanted to have meetings." For B.B., the meeting consisted of an enhancement session.

¶ 27 When New Voices got an audition in California for a record label, defendant told B.B. that stars like Beyonce had to work their way to the top. They "had to do things with record label producers in order to get where they wanted to be." B.B.'s enhancement sessions became practice for the California trip. Defendant showed B.B. how to suck his penis and got her "used to having [her] vagina licked because that was something the producer would do." They began having oral and vaginal sex regularly in defendant's garage.

¶ 28 B.B. testified that before going to California, she, defendant, and T.B. had a "threesome" as practice for seeing the record executive. Defendant "put on a porno" showing "two girls and a guy." He told B.B. to perform oral sex on T.B. while he performed oral sex on B.B. Eventually, defendant stopped the oral sex and began having vaginal sex with B.B. She did not talk to T.B. about what happened because it was confidential and "just something that she and [T.B.] had to do to further make it in the music industry." B.B. testified that at first, she thought she was having sex with defendant to work on her curves. "[T]hen it turned into going to California and working to get a music deal." It then became "more like a practice to meet the guy from the music industry."

¶ 29 When New Voices traveled to California, D.B.'s mother accompanied them because she found out that defendant was the only adult going with the group. B.B. and T.B. stayed in a hotel room with defendant while J.M. and D.B. stayed in a room with D.B.'s mother. B.B. testified that whenever T.B. went to shower, defendant would have sex with B.B. When they came home from the trip, there was a lot of "fussing and fighting" at the airport because J.M.'s mother was there. Defendant told B.B. that his wife and "everybody is mad at him." B.B. left New Voices "a few months" after they returned from California. She was with the group for about two years.

¶ 30 On cross-examination, B.B. stated that after she left the band in 2005, she had no contact with T.B. until 2009, when they became Facebook friends. In December 2010, she spoke with Detective Paul Morache. She could not recall whether she told him about the threesome, but she probably did not because she was focused on what defendant had done to her. She did not remember meeting with Detective John Sweitzer in January 2011, but she remembered meeting with Morache in September 2011. She also did not recall having another conversation with Morache and Assistant State's Attorney Ramirez in April 2014.

¶ 31 B.B. stated that during her sessions with defendant in the garage, defendant's daughters were in "school a lot of the time" and since they were older, "they had a lot more freedom." Defendant's wife would be in the house at times, but she worked a lot and for "the most part, she stayed in her room."

¶ 32 J.M. testified that she joined New Voices in 2004 when she was 16 years old. She was with the group for several months in the summer. They practiced at defendant's house in Park Forest and in the garage where they practiced their instruments. At the time, the group consisted of

her, T.B., B.B., and D.B. While they rehearsed at defendant's house, his daughters were sometimes there and other times it was just defendant and the four girls in the group.

¶ 33    J.M. testified that, one day in defendant's garage, T.B. and B.B. were "tugging on each other's clothes" and defendant reached out to B.B.'s jogging pants, which "fell down" exposing B.B.'s panties. Defendant also tugged at T.B.'s shirt. J.M. thought the behavior was "creepy." J.M. stated that defendant "did not do anything to her or touch her in any way." However, defendant did say that J.M. "had legs that would make a grown man cry." During her time with New Voices, J.M. did not have individual practice sessions with defendant and she did not see defendant take other girls to a different area.

¶ 34    J.M. testified that when the group went to California, all of the girls were supposed to stay with D.B.'s mother. After the trip, defendant and her mother got into an argument and the next day defendant told J.M. she was no longer a member of New Voices.

¶ 35    On cross-examination, J.M. stated that, in California, all of the girls changed into their pajamas in one room and T.B. and B.B. then said they were going to sleep in defendant's room. She testified that it "was their choice." J.M. had concerns, but she did not check on them. B.B. was the one who introduced her to New Voices. B.B. was excited and told J.M. that she was "learning an instrument and singing."

¶ 36    A.I. testified that in November 2004, when she was 16 years old, she auditioned for New Voices and became a member. T.B. and B.B. were the other members of the group at the time. Around Thanksgiving, A.I. had a private session with defendant at his house. She was upset because of rumors about her going around at her school. Defendant told her that the girls talked about her because she was "beautiful" and "talented." He was there for her, and he was "not just [her] manager."

¶ 37    They talked about getting a recording contract. Defendant said there was an "easy way" and a "hard way." The "easy way" involved A.I. going to the executive board room where she would have sex with an executive named Pete. Defendant knew that A.I. had a boyfriend and asked her questions about being sexually active, whether it was easy to "put two fingers" in her vagina, and whether she could perform oral sex. Defendant told A.I. to take off her pants, and he tried to put two fingers in her vagina because "when they get to California, they don't have time to be playing with you, they need to get in and out." Defendant was "mad" that he could only fit one finger and told A.I. that they would have to "stick with oral sex." He also asked A.I. to lift her shirt so he could see her breasts. Defendant told her that she needed to practice having oral sex, and she said she could practice with her boyfriend. Defendant did not like her telling her boyfriend what was going on. After this session, A.I. told her father what had happened, and he called the police.

¶ 38    Commander Todd Beilke testified that, in December 2004, he was a detective with the Park Forest Police Department. At that time, he became aware of a complaint against defendant, and on January 4, 2005, he arrested defendant at his home. After being advised of his *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966)), defendant indicated that he wished to speak with detectives. He initially stated that he was never home alone with A.I., and he denied any inappropriate contact with her.

¶ 39    When confronted with inconsistencies in his statements, defendant made further statements that were memorialized in writing. The statement, which was published in open court, stated in relevant part:

"Just before Thanksgiving I had a girl named [A.I.] trying out for a singing group called [New Voices.] I was talking to [A.I.] and she told me there were rumors about her. She and I talked about her getting a recording contract. I was talking to a guy named Pete who was asking questions about her. I relayed that question one was if her chest sagged or sat up. She lifted up her shirt and showed me her bare breast and says what do you think. I also asked her questions about oral sex. She also took off her jeans and thong and I patted her bare butt. On the Wednesday before Thanksgiving there was a power outage. I used my cell phone to check out her bare butt to see if it was firm or wiggly. I know I should not have done this because she was a minor and I'm sorry this happened. I will not have contact with her in any way or her with me."

¶ 40 Alvin Elmore testified that he met T.B. in 2006 when she was working at Best Buy. He worked in graphics, and T.B. told him that she worked with defendant, who needed work done. Elmore met with defendant, who said "that you have to have a female presence to seal deals." He clarified that defendant did not say "female presence"; rather, he used the term "fluffer." "Fluffer" referred to a woman who could be sent for sexual favors "that would basically close the deal." On cross-examination, Elmore stated that he was contacted by police in January 2014, but he did not tell them defendant used the term "fluffer." He also denied that he and T.B. were boyfriend and girlfriend. They started "hanging out" in 2011 or 2012, "going to movies and things like that."

¶ 41 After presentation of the State's evidence, defendant moved for a directed verdict, which the trial court denied.

¶ 42 Jannifer Nevilles testified for the defense. She has been married 23 years to defendant, but they have been together for 37 years. They have three children together. Defendant used to have a business called Chi Coast Entertainment, and along with his colleague, Becky Buckny, he wanted a girls group that could sing, dance, and play instruments.

¶ 43 In 2003, she and defendant lived in a house in Park Forest. Jannifer worked at TASC Treatment Alternatives, which was also located in the south suburbs, from 8:30 a.m. to 5 p.m., Monday through Friday. She testified, however, that she would sometimes come home for lunch and sometimes come home before picking up a client for testing. Also, if her meeting with clients ended early, she would come home to finish her case notes.

¶ 44 Jannifer testified that New Voices would rehearse at the house and sometimes in the garage. They practiced mostly on weekends, but if the group had an upcoming show, they would practice almost every day. The family owned one car so she would arrange to be home with the car on days that defendant needed it to pick up the girls for rehearsal. On those days, she would be at home. She stated that her daughters would also be at home on rehearsal days. Jannifer described the days with everyone in the house as "chaos." She testified that if she "had to go to the kitchen or somewhere [she] had to climb over furniture. *** It was a lot going on."

¶ 45 Jannifer had a "good relationship" with the girls in New Voices, and she treated them "like my kids." She testified that she never saw defendant take girls to the garage. She was also aware of the California trip and the sleeping arrangements at the hotel. She knew that T.B. continued to work with defendant after New Voices disbanded. In 2006, T.B. moved in with her family. She asked T.B. to leave a year or two later because she had an altercation with one of her daughters. Jannifer never suspected that her husband was having sexual relations with T.B.

¶ 46 On cross-examination, Jannifer stated that defendant had never been in business with Tri-Star Pictures and she was not aware that he had an e-mail address at the company. In 2004, the group was practicing at her house almost every day, and they would spend the night in her daughter's room. She acknowledged that she was not always at home when the group rehearsed, and she sometimes went to her room while they practiced. Jannifer did not know what happened at the house when she was not home. She also acknowledged that she did not go into the garage when defendant held practice sessions there, and she could not say whether defendant provided individual lessons to the girls while she was away from home. Jannifer stated that she was in the house when the incident occurred between A.I. and defendant. She was not in the room when defendant had A.I. pull down her pants and he touched her. She was also not present when defendant talked to "Pete" and had A.I. lift her shirt.

¶ 47 On redirect, Jannifer stated that she could hear the band rehearsing in the garage from her room. Along the back of the house were windows through which one could see into the garage. Those windows were located in the laundry room and in the room shared by her daughters Danielle and Nicole.

¶ 48 Nicole Baldridge testified that she was defendant's daughter. She recalled that when she was a junior in high school, New Voices would rehearse in her house. They practiced in the living room on the weekends, but if they had a show coming up, they would also practice during the week. Nicole was often home during rehearsals because she was "grounded the majority of her adolescent years." She was "good friends" with all the members of New Voices because they were about the same age. She often watched the girls rehearse. When the weather was warm, the group would rehearse in the garage.

¶ 49 On cross-examination, Nicole stated that she got home from school around 2:34 p.m., and sometimes she would leave the house or go on errands with her mother. She also would at times be in her room or the bathroom while the girls rehearsed. She acknowledged that she was not always home when New Voices rehearsed there.

¶ 50 Morache testified that he was a patrol officer when he spoke with T.B. on December 23, 2010, in September 2011, and in October 2013. He did not recall T.B. telling him that defendant got her pregnant, nor did she mention the encounter with Davis and defendant at Davis's home. He would have included that information in his notes. When he spoke with T.B. in 2013, she gave him information about someone named "Chavon." She called him the next day to say that she "did some investigating on her own and found her." T.B. also did not tell Morache that "Chavon" gave her lingerie or that she went to audition for an exotic movie. He did not recall that T.B. said she was not allowed to have a boyfriend or she would be kicked out of the group. Morache did not recall B.B. telling him about private lessons with defendant, but he did remember that she was taken from the other members "and brought to a private session for enhancement in some other room or garage."

¶ 51 On cross-examination, Morache stated that he was a patrol officer in 2010 and his job at the time was to take the initial report and forward it to detectives. He would conduct the interviews and then write the report later. He stated that he did not include everything he was told because the reports were summaries.

¶ 52 Commander Sweitzer testified that on May 10, 2011, when he was a detective, he received a call from someone named Danielle Nevilles. They had a conversation, and he tried to call the number on May 12, 13, and 14, but no one answered. After leaving a voicemail, he tried calling the number again, but it was no longer in service. He did not speak with Danielle in person.

¶ 53    Danielle testified that in 2004, she was 11 or 12 years old and in the third grade. She saw New Voices whenever they rehearsed at her house. They rehearsed in the living room during the winter and in the garage in the summer. Danielle had no after school activities, so she came straight home after school and did not leave the house. In 2011, detectives came to her house and asked about a phone call. She denied seeing naked photos of T.B., B.B., and defendant on a home computer, and she denied that she called Park Forest police about her father. She also denied she changed her phone number or had it disconnected.

¶ 54    During deliberations, the jury sent a note asking why there was a separate charge involving T.B. from "12/03 - 1/04 then from 2/04 - 12/04." The jury was told that they had all the evidence and to continue deliberating. They jury found defendant guilty on all charges except the charge involving T.B. from December 27, 2003, to January 31, 2004.

¶ 55    After the trial court denied defendant's motion for a new trial, he was sentenced to a total of 27 years' imprisonment. Defendant filed this appeal.

## III. ANALYSIS

¶ 57    Defendant first contends that the State failed to prove him guilty beyond a reasonable doubt where the testimony of T.B. and B.B. was vague, inconsistent, and contradictory, and no physical or documentary evidence corroborated their testimony. On a challenge to the sufficiency of the evidence, we must determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis omitted.) *People v. Davison*, 233 Ill. 2d 30, 43 (2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). A reviewing court does not retry the defendant; instead, we must carefully examine the record while acknowledging the fact that the jury saw and heard the witnesses. *People v. Smith*, 185 Ill. 2d 532, 541 (1999). We also keep in mind that although witness credibility is within the province of the jury, its determination is not conclusive. *Id.* at 542. Defendant's conviction will be reversed if the evidence is so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt of defendant's guilt. *Id.*

¶ 58    The State's case focused primarily on the testimony of T.B. and B.B. Defendant contends, however, that T.B.'s testimony was unbelievable because she "did not pinpoint any month, day, or year when she first had sexual contact with [defendant]," she was confused about her age during events in 2004, and her testimony about the incident with Davis was inconsistent with Davis's testimony about the encounter. T.B. said it occurred in 2004, whereas Davis testified that it happened in 2006. T.B. stated that she performed sexual acts with Davis, while Davis did not think she and T.B. engaged in sexual activity. Defendant argues that B.B.'s testimony also contained conflicting statements. She stated that she was in New Voices for two years but testified that she joined the group in 2004 and left it shortly after the California trip in the summer of 2004. B.B.'s testimony regarding what happened during the "threesome" with defendant, and when it occurred, was also inconsistent with T.B.'s testimony. Defendant argues that their unbelievable testimony is insufficient to sustain his conviction beyond a reasonable doubt.

¶ 59    A witness's inability to remember exact dates and times, by itself, does not create reasonable doubt. *People v. Foley*, 206 Ill. App. 3d 709, 715 (1990). It merely affects the weight of her testimony. *Id.* Defendant's trial took place more than 14 years after the offenses occurred. Given the continuing nature of defendant's conduct, it is understandable that T.B.

and B.B. could not remember the exact dates or timing of the incidents. See *People v. Escobedo*, 151 Ill. App. 3d 69, 82 (1986). By returning a guilty verdict, the jury clearly found T.B.'s and B.B.'s testimony credible. The issue here is whether the jury's determination was reasonable in light of the record. *People v. Cunningham*, 212 Ill. 2d 274, 283 (2004).

¶ 60       Importantly, T.B. and B.B. testified consistently that the abuse occurred primarily in 2004, when they were members of New Voices and defendant was their manager. Their testimony that defendant would take them individually for private sessions in the garage during rehearsals, and that he told them they needed these sexual encounters to further their musical careers, was also consistent. Like T.B. and B.B., another former member of the group, A.I., testified that defendant had a private session with her and told her that she needed to perform sex acts in order to succeed in the industry. Regarding the group's California trip, T.B. and B.B. testified that they shared a hotel room with defendant and he performed sexual acts with one while the other was out of the room. J.M.'s testimony confirmed that defendant shared a hotel room with T.B. and B.B. in California, and she stated that the arrangements concerned her. She left New Voices after that trip.

¶ 61       While some discrepancies existed in the witnesses' testimony about the details of certain encounters, they stated consistently and positively that the incidents occurred. T.B. and B.B. testified that a threesome occurred with defendant, although they differed regarding what sexual activity took place and the timing of it. Regarding the incident at Davis's home, Davis corroborated T.B.'s account in significant aspects. T.B. testified that Davis told her to take a bath and shave her private area. Davis similarly testified that she got T.B. into the bathroom for a bath and "gave her a razor to shave" her "vaginal area." Davis's testimony also confirmed that sexual activity took place at her home that evening, even if her details of the encounter differed from T.B.'s testimony. This discrepancy and other conflicts in the testimony merely affect the weight of the evidence, which is a determination for the jury to make. *Escobedo*, 151 Ill. App. 3d at 82.

¶ 62       Defendant points out that J.M. testified she did not see individual members go to the garage with him during rehearsals, and his wife and daughters testified that they were home during rehearsals and did not notice any misconduct. He argues that T.B.'s and B.B.'s testimony that they had sex every time the group rehearsed at his house, with no one noticing, is incredulous "and cannot be believed." Even if jurors believed the testimony of J.M., Jannifer, and Nicole, they were not required to accept any explanation compatible with defendant's innocence and elevate it to the status of reasonable doubt. *People v. Tenney*, 205 Ill. 2d 411, 429 (2002).

¶ 63       In fact, the record supports the jury's finding that defendant had opportunities to engage in sexual acts with T.B. and B.B. at his house. While Jannifer stated that she was often home when New Voices rehearsed, she also testified that the house was crowded and chaotic. She may not have kept track of every person in the house at any given time. Also, the garage was detached from the house. Although Jannifer testified she could hear the band when they rehearsed in the garage, that does not mean she could hear what was happening during individual sessions in the garage.

¶ 64       Furthermore, B.B testified that when she was at the house, Jannifer often stayed in her room. Contrary to Jannifer's testimony, B.B. and T.B. testified that Jannifer generally was not home during the day. Regarding the presence of defendant's daughters, B.B. testified that they were often not home because they "had a lot more freedom." Defendant's daughter Nicole acknowledged that she occasionally ran errands with her mother after school and she was not

always at the house when New Voices rehearsed. J.M., who was with New Voices only for a couple months, confirmed that sometimes they were alone with defendant when they rehearsed in his house.

¶ 65    In reviewing the record, we cannot say the evidence supporting defendant's conviction was so improbable or unsatisfactory that it creates a reasonable doubt of his guilt. Although defendant contends no physical evidence was presented to support the sexual assault charges, it is well established that physical evidence is not required to show that a sexual assault occurred. *People v. Shum*, 117 Ill. 2d 317, 356 (1987). We therefore find the evidence in the record sufficient to convict defendant of the offenses beyond a reasonable doubt.

¶ 66    Defendant next contends his trial counsel provided ineffective assistance when he did not object to the joinder of T.B.'s and B.B.'s charges. To prevail on his claim, defendant must show that (1) his attorney's performance fell below an objective standard of reasonableness and (2) defendant was prejudiced by his attorney's deficient performance. *People v. Hodges*, 234 Ill. 2d 1, 17 (2009). The failure to satisfy either prong precludes a finding of ineffective assistance of counsel. *People v. Patterson*, 192 Ill. 2d 93, 107 (2000).

¶ 67    The State sought to join the charges under section 111-4(a) of the Code, which provides:

> "(a) Two or more offenses may be charged in the same indictment, information or complaint in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are based on the same act or on 2 or more acts which are part of the same comprehensive transaction." 725 ILCS 5/111-4(a) (West 2018).

The trial court has broad discretion regarding the joinder of charges, and a reviewing court will not reverse the trial court's decision absent an abuse of discretion. *People v. Fleming*, 2014 IL App (1st) 113004, ¶ 38. "A trial court abuses its discretion where its decision is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the trial court's view." *Id.*

¶ 68    Two or more offenses may be charged in the same indictment if the offenses "are based on the same act or on 2 or more acts which are part of the same comprehensive transaction" (725 ILCS 5/111-4(a) (West 2018)), unless defendant would be prejudiced by the joinder (*id.* § 114-8). No specific criteria are used to determine whether separate offenses are part of the same comprehensive transaction. *People v. Trail*, 197 Ill. App. 3d 742, 746 (1990). However, important factors to consider include (1) the proximity in time and location of the offenses, (2) the identity of evidence needed to establish a link between the offenses, (3) whether the offenses shared a common method, and (4) whether the same or similar evidence would prove the elements of the offenses. *Fleming*, 2014 IL App (1st) 113004, ¶ 36. Whether to sever or join charges is a determination that "turns on the facts of each particular case." *People v. Patterson*, 245 Ill. App. 3d 586, 588 (1993).

¶ 69    Here, there is proximity of time and location where the offenses against T.B. and B.B. occurred primarily in 2004 and mostly took place in defendant's garage or in a California hotel.

¶ 70    Regarding the second factor, identity of evidence, the inquiry is "not whether evidence of the two crimes is similar or *identical* but rather whether the court can *identify* evidence linking the crimes." (Emphases in original.) *People v. Walston*, 386 Ill. App. 3d 598, 605-06 (2008). T.B. and B.B. were under 18 years of age when they joined New Voices. In 2004, they saw defendant almost every day for rehearsals because he was the manager of the group. While the group rehearsed at defendant's house, he would take T.B. and B.B. separately to the garage for private sessions. Defendant committed the offenses during these sessions. Defendant also

stayed in a hotel room with T.B. and B.B. when New Voices traveled to California, and his offenses continued there. He repeatedly told T.B. and B.B. that they had to perform sex acts with him to further their careers in the industry. This common evidence links the offenses involving T.B. and those involving B.B. It goes without saying that defendant would not have sexually assaulted these minors had they not wanted a career in music and joined New Voices.

¶ 71    The third factor, common method, considers "whether the offenses were part of a 'common scheme,' so that each of the offenses supplies a piece of a larger criminal endeavor." *Id.* at 606-07. Defendant contends that there was no common method or scheme because defendant's "method was distinct between T.B. and B.B.," where he told T.B. she needed to practice sex acts in order to get a recording contract and he told B.B. that she needed to engage in sexual activity to develop curves. However, whether defendant committed multiple offenses in the same manner is not relevant to this inquiry. *Id.* at 606. Instead, we must consider whether the separate offenses are part of a "grander criminal scheme." *Id.* at 608-09; *Fleming*, 2014 IL App (1st) 113004, ¶ 44. When determining if defendant committed multiple crimes as part of a common scheme or plan, we focus on "defendant's state of mind or purpose in committing the offenses [rather] than on the factual similarities of the offenses." *People v. Hansen*, 313 Ill. App. 3d 491, 505 (2000).

¶ 72    With T.B. and B.B., defendant had the same overall purpose: to engage in sexual activity with them by telling them they had to do so if they wanted a career in the music industry. T.B. testified that defendant told her about "a record executive in California named Pete, and *** that [T.B.] would be asked to have sex with him in order to land that record deal, even if [she] was talented that [she] would have to have sex with him." He said, "that's the way it works in the business." Defendant also told T.B. that because she was a virgin, she would need "to prepare to have sex" with Pete, and "he should be the one to do that." He told T.B. that she "needed to learn oral sex and to perform oral sex on him." After that, almost every time T.B. went to defendant's house to rehearse he performed oral sex on her and made her perform oral sex on him. He told her that they were "practicing to lead up to meeting Pete." After New Voices dissolved, T.B. continued having sex with defendant because she "wanted to continue music." T.B. testified that at the time, she did not see defendant as "the person inflicting the pain" because she thought "it was the industry and this Pete person that wanted it."

¶ 73    B.B. testified that defendant would tell her how T.B. "had breasts" and Tiffany "was very hippy." Defendant could help B.B. because "what happens with the group is for the benefit of the group." He told B.B. she "had the powerhouse voice *** but image is everything and [she] just didn't have the image." B.B. thereafter started "enhancement sessions" with defendant. When New Voices got an audition in California, defendant told B.B. that stars like Beyonce had to work their way to the top. They "had to do things with record label producers in order to get where they wanted to be." B.B. thought that sex was "just something that she and [T.B.] had to do to further make it in the music industry."

¶ 74    A.I.'s testimony further supports that defendant acted pursuant to an overall plan. She testified that during a private session with defendant at his home, they talked about getting a recording contract. Defendant told A.I. there was an "easy way" and a "hard way." The "easy way" involved A.I. going to the executive board room where she would have sex with an executive named Pete. Defendant told A.I. to take off her pants, and he tried to put two fingers in her vagina because "when they get to California, they don't have time to be playing with you, they need to get in and out." He also asked whether she could perform oral sex.

- 13 -

Defendant's own statement confirmed his reference to Pete as the reason for his insistence on sexual activity with the girls.

¶ 75     The evidence shows that defendant's conduct toward T.B. and B.B. was part of his grander scheme to use his position as the manager of New Voices to engage in sex acts with teenagers who joined the group hoping for a successful music career. Defendant told these girls that they needed to have sex with a record executive and that they would have to perform sex acts with defendant in preparation for that encounter. As a result, T.B. and B.B. took part in a variety of sexual activities with defendant, including vaginal and oral sex. The charges against defendant are based on these acts. Under the facts of this case, we find no error in joining the charges. As such, defense counsel did not perform deficiently where his objection to the joinder would have been futile. *People v. Lawton*, 212 Ill. 2d 285, 304 (2004).

¶ 76     Defendant also was not prejudiced by the joinder. The State sought to admit T.B.'s and B.B.'s testimonies in each other's cases pursuant to section 115-7.3 of the Code. This section applies to criminal cases where "the defendant is accused of predatory criminal sexual assault of a child, aggravated criminal sexual assault, criminal sexual assault, aggravated criminal sexual abuse, criminal sexual abuse, child pornography, aggravated child pornography, criminal transmission of HIV, or child abduction." 725 ILCS 5/115-7.3(a)(1) (West 2018). If the defendant is accused of an offense set forth in subsection (a)(1),

> "evidence of the defendant's commission of another offense or offenses set forth in paragraph (1) ***, or evidence to rebut that proof or an inference from that proof, may be admissible (if that evidence is otherwise admissible under the rules of evidence) and may be considered for its bearing on any matter to which it is relevant." *Id.* § 115-7.3(b).

¶ 77     The legislature enacted section 115-7.3 so that courts could admit other-crimes evidence "to show defendant's propensity to commit sex offenses if the requirements" are met. *People v. Donoho*, 204 Ill. 2d 159, 176 (2003). The trial court below allowed T.B.'s and B.B.'s testimony in each other's cases to show "motive, intent, knowledge, absence of mistake and *modus operandi*," as well as propensity. "[W]here, as here, 'other crimes' evidence is properly admissible, the potential prejudice to a defendant of having the jury decide two separate charges is greatly diminished because the jury is going to be receiving evidence about both charges anyway." (Emphasis omitted.) *Trail*, 197 Ill. App. 3d at 746. Defendant's failure to establish either the deficiency or the prejudice prong is fatal to his ineffective assistance of counsel claim. *People v. Simms*, 192 Ill. 2d 348, 362 (2000).

¶ 78     Defendant's final contention is that the admission of irrelevant evidence at trial unduly prejudiced him. Specifically, defendant objects to testimony that he had a joint encounter with T.B. and Davis and Elmore's testimony that defendant told him he needed a "fluffer" to "seal" the deal in the music industry. He argues that both incidents took place well after the acts alleged in the indictments occurred and the testimony served only to paint defendant as a sexual deviant—a "music-industry version of Harvey Weinstein."

¶ 79     The admissibility of evidence is within the discretion of the trial court, and its ruling will not be reversed absent an abuse of discretion. *People v. Ochoa*, 2017 IL App (1st) 140204, ¶ 39. Even if evidence is relevant, the trial court "must weigh the relevance of the evidence to establish the purpose for which it is offered against the" potential undue prejudice to defendant. *People v. Thingvold*, 145 Ill. 2d 441, 452 (1991). Whether the probative value of the evidence is outweighed by its prejudicial effect is a determination made within the sound discretion of

the trial court. *People v. Illgen*, 145 Ill. 2d 353, 375 (1991). "An evidentiary ruling constitutes an abuse of discretion when it is arbitrary, fanciful, or unreasonable." *People v. Irwin*, 2017 IL App (1st) 150054, ¶ 27.

¶ 80     T.B. testified that the encounter with Davis and defendant took place in 2004 or 2005, which would place the event within the timeframe of the indictments. Although Davis testified that it occurred in 2006, such conflict in the testimony did not automatically render it irrelevant. It was for the jury, not the trial court, to determine the credibility of the witnesses and resolve conflicts in the evidence. *People v. Holmes*, 141 Ill. 2d 204, 243 (1990). The trial court allowed the testimony, finding that defense counsel could cross-examine the witnesses regarding the time period of the incident. The court further found the unsavory evidence "intrinsic" because it was "part of the allegations in the indictment." Although the court acknowledged the prejudicial effect of such testimony, it found that the negative connotation could not be helped where defendant was charged with the crimes of aggravated criminal sexual abuse and criminal sexual assault.

¶ 81     We find no abuse of discretion in the admission of this evidence. Evidence is relevant if it has any tendency to make the existence of any fact consequential to the determination of the action more probable than it would be without the evidence. *People v. Lewis*, 165 Ill. 2d 305, 329 (1995). An incident of sexual activity between T.B. and defendant clearly is relevant to the criminal sexual abuse and criminal sexual assault charges here. Also, as the trial court found, any prejudicial effect on defendant resulted from the nature of the offenses. Details of sexual abuse or sexual assault are, by their nature, disturbing to hear. Although the evidence necessarily casts defendant in a negative light, there is no suggestion that the jury's determination here was unduly based on hatred, contempt, or horror. See *People v. Lynn*, 388 Ill. App. 3d 272, 278 (2009) (finding that prejudicial effect is improper where the evidence in question somehow casts a negative light on the defendant for emotional reasons that have nothing to do with the case).

¶ 82     Regarding Elmore's testimony, defendant acknowledges that he did not object to admission of the evidence at trial. When defendant does not challenge an error at trial or include the error in a posttrial motion, he forfeits review of that error. *People v. Johnson*, 238 Ill. 2d 478, 484 (2010) (citing *People v. Enoch*, 122 Ill. 2d 176, 186 (1988)). Under Illinois's plain-error doctrine, a reviewing court may consider a forfeited claim when:

     "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *People v. Hammonds*, 409 Ill. App. 3d 838, 854 (2011).

However, if there is no reversible error, there can be no plain error. *People v. Cosby*, 231 Ill. 2d 262, 273 (2008).

¶ 83     Defendant argues that Elmore's testimony was inadmissible as other-crimes evidence, but Elmore did not testify about a crime committed by defendant. Rather, he testified about defendant's philosophy on having a career in the music industry. Defendant told Elmore that he needed a female presence, or "fluffer," to send for sexual favors. Furthermore, this evidence was cumulative to Davis's testimony that defendant told her she "needed to be sexual with him *** in order to get into the entertainment industry." T.B. and B.B. also testified extensively

- 15 -

about defendant's philosophy on the matter. There is no reasonable probability that if the trial court had excluded Elmore's testimony, the outcome of the trial would have been different. Therefore, if any error occurred in admitting Elmore's testimony, it was harmless error. See *Lynn*, 388 Ill. App. 3d at 282.

¶ 84                                    IV. CONCLUSION
¶ 85        For the foregoing reasons, we affirm defendant's conviction and sentence.

¶ 86        Affirmed.