2024 IL App (1st) 230120-U

No. 1-23-0120

THIRD DIVISION
December 11, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 20 CR 0484601 |
| | ) | |
| CHRISTIAN GUADERRAMA, | ) | Honorable |
| | ) | Alfredo Maldonado, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE D.B. WALKER delivered the judgment of the court.
Presiding Justice Lampkin and Justice Reyes concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm defendant's convictions where his right to a speedy trial was not violated, the indictment sufficiently informed him of the charges against him, the evidence was sufficient to convict him beyond a reasonable doubt, and no reversible error occurred at trial. We also affirm defendant's sentence where it was within the applicable range for his offenses.

¶ 2    Defendant Christian Guaderrama was convicted after a bench trial of predatory criminal sexual assault, aggravated criminal sexual abuse and aggravated domestic battery. He received a

sentence of 32 years in the Illinois Department of Corrections. On appeal, defendant contends that his convictions should be reversed where 1) he was denied his constitutional and statutory right to a speedy trial, 2) the indictment failed to specify the dates of the alleged offenses, 3) the State failed to meet its burden of proof, and 4) the trial court committed error in admitting statements disclosed shortly before trial, allowing the prosecutor to bolster the credibility of State witnesses and misstate evidence during closing argument, and admitting a stipulation in violation of his confrontation rights. Defendant also contends that his sentence was excessive. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      Defendant was arrested on March 10, 2020 for his conduct towards the victim, N.G. The State charged defendant by indictment with four counts of predatory criminal sexual assault, one count of criminal sexual assault, one count of aggravated criminal sexual abuse, one count of aggravated domestic battery, and one count of aggravated battery of a child under 13 years of age. According to the indictment, the offenses occurred "between August 01, 2019 and March 05, 2020 at and within the County of Cook."

¶ 5      At defendant's bench trial, Wanda Massey testified that she was an administrative clerk at the 8th District police station in Chicago. On March 5, 2020, she was at the front desk when she observed "a little girl pacing back and forth." The girl ran through the revolving doors and she "scrunched down." Massey asked the girl, "[W]hat's the matter?" She learned that the girl's name was N.G., and she thought N.G. was lost. Massey walked N.G. to Officer Antonia Galloza. Shortly thereafter, Massey observed a man enter the station. He was loud and seemed upset. Officer Galloza put her hand up to stop him. On cross-examination, Massey acknowledged that she could

not see or hear the conversations between Officer Galloza and N.G., and Officer Galloza and the man. She stated that she would not recognize the man if he was in court.

¶ 6    Alejandra Mora testified that she was N.G.'s mother. She and defendant were married for about six years, and during that time they lived in Chicago with their two young children and her children from a previous relationship. When N.G. was nine years old, the family moved to a three-bedroom apartment on 64th Place. Mora worked at Freshii from 7 a.m. to 3 p.m. Defendant stayed home so that he could take the children to school and pick them up in the afternoon.

¶ 7    N.G.'s tenth birthday was on March 5, 2020. That morning, defendant asked Mora if N.G. could miss school because it was her birthday. Mora said, "no." While she was at work, Mora received a call from the school that N.G. was in trouble. N.G. had never been in trouble at school before. As Mora was returning home, defendant called and said that her "f**king daughter is missing, she ran away from school." Mora could not understand why he was so angry and upset. She told defendant to call the police and report N.G. missing, which he did.

¶ 8    Mora met her parents at the train station and as they drove home, defendant called again to let Mora know that N.G. was at the police station. Mora offered to pick up N.G., but defendant was already on his way to the station. Mora went home and was later informed that the police would not release N.G. to defendant.

¶ 9    When Mora arrived at the police station, she observed that defendant was "very agitated and angry." He was yelling that he was not allowed to see his daughter. Mora was taken to a room where N.G. told her that defendant "has been having sex" with her. When Mora asked whether defendant touched N.G. or if "he had his penis inside her vagina," N.G. answered, "yes" to both. N.G. said that it occurred "numerous" times in the morning while Mora was at work.

¶ 10    Mora accompanied N.G. to the hospital. After N.G. returned home, she expressed concern over how long defendant would be "put away." N.G. said she would miss defendant even though "what he did was wrong." She did not tell Mora earlier because "she was scared and [defendant] had threatened her." N.G. said that she told defendant to stop and that she would tell someone what was happening. Defendant then punched N.G. in the stomach and asked her, "who are you going to tell?" N.G. answered, "nobody."

¶ 11    After Mora was excused, the trial court heard defense counsel's objections to two statements tendered by the State shortly before trial. The trial court did not admit one of the statements. The second was Mora's statement that she had found a pair of N.G.'s underwear on the floor of Mora's bedroom, which was out of the ordinary. The trial court allowed this statement, finding that it was not prejudicial and could be addressed on cross-examination.

¶ 12    Mora returned to the stand and testified that she discovered N.G.'s underwear on her bedroom floor on March 4th after she returned from work. Defendant was sitting a few feet away in the living room watching television. When Mora asked N.G. why her underwear was in Mora's bedroom, N.G. looked scared. Defendant's attention turned to Mora. Mora asked if N.G. was changing clothes in her bedroom and N.G. nodded "yes." Defendant turned back to the television.

¶ 13    Mora testified that between October and November 2019, N.G. complained that she felt pain in her stomach. She also told Mora that she was bleeding from her vagina. Mora believed "it could have been her period" even though N.G. was only nine years old. N.G. said that she saw blood only when she "wiped" after going to the bathroom. Mora spoke with defendant about making a doctor's appointment for N.G., "just to ask questions and stuff." Defendant did not believe N.G. needed to see a doctor because "it was probably a UTI."

¶ 14    On cross-examination, Mora testified that defendant and N.G.'s father went to high school together. Mora called N.G.'s father when she learned that N.G. was missing. N.G.'s father had regular contact with N.G. He had spoken to her on her birthday and gave her flowers. N.G. had expressed a desire to live with her father. She had difficulty with homework and sometimes stayed home from school, claiming her stomach hurt. Defendant watched the children during the day while Mora worked. Mora learned after March 5th that defendant directed N.G. to smoke marijuana. Mora never observed defendant invade N.G.'s "private space," and he never threatened the children in front of her. Mora also acknowledged that defendant took N.G. to a father-daughter dance, which N.G. enjoyed.

¶ 15    On redirect, Mora stated that defendant was the one who allowed N.G. to stay home from school because Mora was at work. Defendant occasionally allowed N.G. to miss school even if she was not sick, and Mora would learn of it when the school called her.

¶ 16    N.G. testified that at the time of trial, she was 12 years old. She identified defendant in court as her stepfather. She first met defendant when she was four years old, and she described him as "nice and fun."

¶ 17    March 5, 2020 was N.G.'s tenth birthday and a school day. After her mother left for work, defendant took N.G. out of her bedroom and brought her to his room. He sat on the bed and pulled off N.G.'s jumpsuit and her underwear. He then grabbed the "pink lotion" next to him and put the lotion on "[t]he part where he pees with." Defendant told N.G. to lay on her stomach on the bed. He then got on top of her and put "the part where he pees with in [her] butt." N.G. felt pain and heard defendant's "heavy breathing." Defendant was "moving back and forth." He eventually stopped, pulled his penis out of her butt, and told N.G. to "get out." N.G. testified that this happened "more than ten" times and started when her mother began working at Freshii in 2019.

¶ 18    On one of those occasions, N.G. told defendant that if he did not stop, she would tell someone. He punched her in the stomach and said, "who [are you] going to tell?" N.G. answered, "nobody." When N.G. was in fourth grade, she was crying as defendant moved back and forth with his penis in her butt. He said she was "being too loud" and pushed N.G.'s head into the pillow. N.G. could not breathe. After he finished, he told N.G. to put her clothes on and leave. N.G. described another time when she was in the fourth grade and defendant brought her to his bedroom and took off her clothes. He lifted N.G.'s legs with his left hand and put lotion on his penis. Defendant then inserted his penis into her butt. As he moved back and forth, the bed was "making a little noise." On another occasion, defendant brought a "glass thing" which he lit and smoked. He told N.G. to "smoke it," but she refused. He "made [her] do it" and she started to cough. N.G. ran to the bathroom where she vomited. Defendant brought N.G. to his bedroom and took off her clothes. After putting lotion on his penis, he got on top of N.G. She felt sick and could feel his penis touching her. N.G. testified that defendant kept her home from school "a lot" so he could touch her.

¶ 19    On her tenth birthday, March 5, 2020, N.G. went to the police station after school. She testified that she went to the police station because she "didn't want to be touched anymore." She did not tell anyone she was going to the police station. Once there, she paced back and forth because she was scared and did not want defendant to see her.

¶ 20    At the police station, N.G. was taken into a room where a female police officer spoke to her. N.G. wrote on a piece of paper what she wanted to tell the police. She could hear defendant screaming "where's my daughter," and he sounded worried and scared. N.G. was taken to the hospital where she told the doctor that her stepfather "has sex with me. When I tell him I'm going

to tell someone, then he punches me in the stomach." N.G. also spoke with a woman at the child advocacy center. She told the woman that her stepfather touched her.

¶ 21    On cross-examination, N.G. stated that she was going into seventh grade, and she had a math tutor. She stated that she told her brother what was happening, but she was afraid to tell her teachers. N.G. did not tell her mother at first because "she would be scared and [N.G.] would be crying." She did not tell defendant's mother because she thought she would tell defendant.

¶ 22    N.G. testified that defendant did not have her smoke marijuana on her birthday. She acknowledged that she spoke with prosecutors but that she was testifying "in my own words." N.G. wanted to live with her father because she did not see him often. She and her mother agreed that if she did well in school, she could live with him. She did not tell her father what was happening with defendant because she was scared.

¶ 23    On redirect, N.G. testified that defendant had been a good stepfather, and she used to have fun with him. She was not comfortable talking about what happened with defendant, so the prosecutor played games and discussed other things before talking about the case.

¶ 24    Illinois State Police forensic biologist Veronica Jackson testified as an expert. The evidence in the case included N.G.'s jumpsuit, which Jackson tested for semen. She found stains on the front right and front left legs, and two stains in the crotch area that indicated semen. On cross-examination, Jackson stated that her testing was based on a minimal amount of substance found on the jumpsuit. She also agreed that the protein present could be found in other bodily fluids. She did not test the vaginal, anal, or fingernail swabs.

¶ 25    The State stipulated that Angela Kaeshamer would testify as an expert in forensic DNA. If called to testify, Kaeshamer would state that she tested the sexual assault kit evidence and buccal swabs in the case. She detected male DNA in the non-sperm fraction of the vaginal swab, but she

could not identify a male donor of the DNA. She detected male sperm on one of the anal swabs, but no DNA profile was identified. No male DNA was detected in the remaining oral, vaginal and anal swabs. No male DNA was found in N.G.'s fingernail scrapings. Male DNA was found in four sperm fractions on the jumpsuit, but the profiles were incomplete and not suitable for comparison. Seven fractions from the jumpsuit contained male DNA with a mixture of at least three people, including N.G. None of the male profiles were suitable for comparison.

¶ 26     Illinois State Police forensic scientist Karen Abbinanti testified as an expert. She performed Y chromosome testing in the case. After testing the vaginal swabs, Abbinanti found a male DNA profile from one donor that included defendant. She testified that the likelihood that defendant or a paternal relative was the donor compared to an unrelated male was three times more likely. Defendant was also included as one of two male DNA contributors to the stain from the crotch area of the jumpsuit. Abbinanti testified that this profile would be expected to occur in 1 in 2800 unrelated white males, 1 in 2300 black males, or 1 in 2000 unrelated Hispanic males at a 95% confidence level. Defendant was also included as one of three male donors from the leg of the jumpsuit. This profile would be expected to occur in 1 in 2800 unrelated white males, 1 in 2300 black males, or 1 in 2000 unrelated Hispanic males at a 95% confidence level.

¶ 27     On cross-examination, Abbinanti agreed that DNA could be transferred from regular contact. DNA transfer could occur if clothing were kept in the same hamper and a liquid component was present. Abbinanti did not receive the anal swabs for testing. She agreed that DNA could be transferred if one touched clothing and then touched another person.

¶ 28     Kristina Novak testified that she is a registered sexual assault nurse examiner (SANE) at Advocate Christ Medical Center. On March 5, 2020, she treated N.G. N.G. had written a note stating, "He has sex with me. Then I tell him that I am going to tell someone. Then he punches me

in the stomach." Novak examined N.G. and found no visible signs of vaginal or anal injuries. She explained that the use of lubricants could reduce the risk of tearing or trauma that causes bleeding. N.G. tested negative for sexually transmitted diseases. She found no trauma in the abdominal area.

¶ 29    The parties stipulated that bilingual trauma therapist Stephanie Teutli, a forensic interviewer at the Chicago Children's Advocacy Center, spoke with N.G. on March 6, 2020. The interview was recorded and if called to testify, Teutli would state that People's Exhibit 11, a DVD of the interview, represented a true and accurate depiction of the interview.

¶ 30    The parties also stipulated that if called to testify, Detective Brian DeJesus would state that on March 5, 2020, he investigated N.G.'s case. He and his partner recovered a bottle of pink Johnson's Baby Lotion from Mora's bedroom. He also took a buccal swab from defendant.

¶ 31    The People's Exhibits 1-14 were admitted without objection and the State rested its case. Defendant filed a motion for a directed finding, which the trial court denied.

¶ 32    Dr. Karl A. Reich testified for the defense. He reviewed the lab reports produced in the case and stated that he was familiar with the testing methods used by the Illinois State Police. Dr. Reich disagreed with the conclusions in the lab reports. He opined that although the tests for semen were positive, that did not mean semen was present. He explained that semen is a combination of seminal fluid and sperm. Other bodily fluids can cause a false positive to occur. There was no indication that samples were tested for actual sperm cells. Dr. Reich also disagreed with Abbinanti's findings and analysis. He opined that a DNA profile with more than one contributor could "never determine the absolute number, just a minimum number of contributors." He believed the testing should have eliminated all other male members of N.G.'s household. Dr. Reich concluded that the fabric of the jumpsuit captured environmental DNA. He opined that the testing results were "meaningless."

¶ 33    Defendant testified at trial that he was 30 years old. When he married Mora, she had two children, N.G. and J.G., who were three years old and one year old, respectively. He stated that he saw a doctor when he was in the Army, and he has been taking antidepressants for post-traumatic stress disorder and bipolar disorder.

¶ 34    The family lived with defendant's parents after the marriage, and his parents helped to watch the children. After two more children were born, the family moved to an apartment. Mora began working for Freshii in 2019 while defendant stayed home with the children. Defendant focused on N.G.'s education because she did not like homework. He admitted having a medical marijuana card but denied smoking in front of the children. Defendant stated that N.G.'s father called her "six or seven times a week" in 2018 and 2019, and that she spent time with her father.

¶ 35    Defendant testified that in 2019, he and N.G. had a good relationship. He and Mora decided together whether to keep N.G. home from school. He did not know why N.G. missed so many days of school. N.G. wanted to live with her father, but he and Mora decided it would not be in N.G.'s best interest to do so. Defendant believed that N.G. viewed him as the reason she could not see her father, and she resented him as a result. In February of 2020, defendant took N.G. to a father-daughter dance. He did not take her to any other location by herself.

¶ 36    Defendant testified that he never engaged in "inappropriate sexual contact" with N.G. He never took off his clothes in front of her or put his finger in her body. He denied causing N.G. bodily harm by striking her, and he never forced N.G. to smoke marijuana.

¶ 37    On March 5, 2020, defendant learned that N.G. left school to look for her father. Defendant asked the school to call the police. Defendant called the police about 20 to 25 minutes after he spoke with Mora. The police informed defendant that N.G. was at the 8th District station. He called Mora, who offered to get N.G., but defendant told her to go home instead because he was closer

to the station. When he arrived at the station, he was not allowed to speak to N.G. Defendant acknowledged that he was "a loud person in general" and that he "got loud" at the station. He was very scared and thought N.G. had been kidnapped. Defendant did not know why N.G. went to the police station. He identified the pink lotion as belonging to his baby daughter.

¶ 38     On cross-examination, defendant stated that he was 6'1" tall and weighed 210 pounds. He stated that N.G. trusted him and he did not know why she made these allegations against him. He did not recommend that N.G. see the doctor for her bleeding because he thought she had a UTI. He agreed that N.G. sometimes loved school and she missed her friends when she was not at school. Defendant also agreed that March 5, 2020 was the only time N.G. had ever run away.

¶ 39     On redirect, defendant explained that he smoked marijuana in the bathroom because he could open the window. Defendant was terrified when N.G. ran away because the children were his responsibility. The defense then rested.

¶ 40     The State waived closing argument but reserved rebuttal. In closing, defense counsel argued that N.G. was not a credible witness. Counsel argued that it was "not believable" that N.G. would endure such abuse "for months and months and months without *** making an outcry to anybody or anywhere." He believed N.G. was coached by her attorneys prior to testifying. Counsel argued that the lack of physical evidence supporting N.G.'s allegations proved that it did not occur. Counsel reiterated that N.G. never made an outcry prior to March 5, 2020 to her mother, grandparents, father, teachers or the police. Counsel argued that N.G. had a motive to accuse defendant of these offenses so that she could live with her father.

¶ 41     In rebuttal, the prosecutor argued that N.G. did not tell anyone what was happening before March 5th because "her ten-year-old brain couldn't find the right words or pick the right person or

the right time or the right place to tell someone that the person that she loves, that she feels as though is her father, is doing something awful to her." The prosecutor continued:

"And it took so long because it takes time to destroy that level of trust and love. But with every thrust of his penis, with every penetration, he broke that trust every time until she couldn't take it anymore. He was the only real father figure that was present in her life. This was very difficult for her, but it was easy for him because he controls the crime scene."

¶ 42    Responding to the DNA evidence, the prosecutor argued that "[i]t corroborates [N.G.] because he's not ejaculating all over her." Rather, defendant uses N.G. "up to a point, lube[s] himself up every time, use[s] her like whatever, and then kick[s] her out, which he does every time." The prosecutor continued, arguing that "[s]he can't make this up. *** She has zero idea of the importance of those things, of being kicked out of the room." The prosecutor argued that the DNA evidence "could not be more perfect for [N.G.] There's no way she could make this up."

¶ 43    In making its determination, the trial court first addressed the DNA evidence. The court concluded that the evidence neither supported nor undermined N.G.'s testimony. Although the DNA evidence was "weak," the court did not find the evidence relevant to its decision.

"[T]his case does not rise and fall with the forensic evidence. It really doesn't. Nor does it have to. This case rises and falls with the testimony of the complaining witness, who I found to be credible. I found her testimony to be consistent, to be clear, and logical. That she testified a couple days ago as a 12-year-old says a lot. Because I don't say that often. I have a lot of people testify before me, but this is a witness who was not impeached. Her testimony was entirely clear. I don't find that to be evidence of coaching. I don't find that to be in any way evidence of some sort of grand conspiracy.

What I do find is that it's evidence that a child, who was exposed to things she should never have seen or known about, [was] sexualized in a manner that should never have happened. One of the most compelling parts of her testimony was when she testified about the defendant being on top of her and moving, breathing, and that squeaking. That squeaking the bed makes, the sexual activity, that squeaking that the adults in the room know what she's talking about but that a ten-year-old should not and yet she did."

¶ 44 The trial court acknowledged defendant's testimony but did not find him to be a credible witness. The court found defendant guilty of all eight counts charged.

¶ 45 Defendant filed a posttrial motion raising issues of reasonable doubt, insufficient indictment, violation of his right to a fair trial, improper rebuttal argument by the State, speedy trial violations, and a violation of defendant's confrontation right regarding the stipulation of Stephanie Teutli. After considering the parties' arguments, the trial court found defendant's convictions on Counts 1 and 2 (predatory criminal sexual assault) proper, as well as his convictions on Count 6 (aggravated criminal sexual abuse) and Count 7 (aggravated domestic battery). However, the trial court vacated its findings on Counts 3 to 5 because there was insufficient evidence that defendant penetrated N.G. with his finger. The court also vacated Count 8, finding insufficient evidence to support that count. Defendant filed a motion to reconsider the court's rulings on Counts 6 and 7, which the trial court denied.

¶ 46 The case proceeded with sentencing. In aggravation, the State argued that N.G. was sexually abused by her stepfather, whom she trusted and loved. Defendant purposely waited until Mora left for work in the morning to abuse N.G. Mora and N.G. provided victim impact statements.

¶ 47 In mitigation, defendant's mother, Patricia Palma, testified as a witness. She stated that defendant has a history of tinnitus and lung damage. Palma described defendant as "loving, caring,

helpful." Defendant did not finish high school, but he received his GED. Defendant also joined the military and was honorably discharged. Defense counsel argued that defendant had no prior criminal convictions and suffered from physical impairments. Counsel requested sentences "at the minimum range of possible sentences."

¶ 48    Before imposing defendant's sentence, the trial court considered the evidence presented at trial, the presentence investigation report, the victim impact statements, and arguments from both parties. The trial court also considered the statutory and non-statutory factors relevant in sentencing. The court found the case "beyond tragic and heartbreaking." N.G. had her innocence "literally stolen from her." The court noted "the disintegration of a family" and that people on both sides "are going to be forever scarred." As mitigation, the court acknowledged defendant's lack of criminal history and his service in the military. Defendant was also loved by his family.

¶ 49    The available sentencing range was "quite lengthy," which was "consistent with what [defendant] did and what he did was horrific." On Counts 1 and 2, both Class X offenses for predatory criminal sexual assault, the trial court sentenced defendant to 13 years' imprisonment for each count. These sentences would be served consecutively. The court sentenced defendant to 6 years' imprisonment on Count 7 (Class 2 aggravated domestic battery), to be served consecutively to the sentences for predatory criminal sexual assault. On Count 6 (Class 2 aggravated criminal sexual abuse), the court sentenced defendant to 6 years' imprisonment, to be served concurrently. Therefore, the trial court sentenced defendant to an aggregate term of 32 years' imprisonment, with a mandatory supervised release term of three years to life. Defendant did not file a motion to reconsider his sentence but instead filed this appeal.

¶ 50                                    II. ANALYSIS

¶ 51                              A. *Speedy Trial Violation*

¶ 52    Defendant first contends that his right to a speedy trial was violated where he was arrested

on March 10, 2020,[1] and remained in custody until his trial on July 18, 2022. It is well-established

that defendant has a fundamental right to a speedy trial under the federal and Illinois constitutions,

as well as a statutory right pursuant to section 103-5 of the Code of Criminal Procedure (Code)

(725 ILCS 5/103-5 (West 2022)). See *People v. Van Schoyck*, 232 Ill. 2d 330, 335 (2009).

Defendant argues that both types of speedy trial rights were violated.

¶ 53    Regarding defendant's statutory right, section 103-5(a) provides, in relevant part:

> "Every person in custody in this State for an alleged offense shall be tried by the court
>
> having jurisdiction within 120 days from the date he or she was taken into custody unless
>
> delay is occasioned by the defendant ***. Delay shall be considered to be agreed to by the
>
> defendant unless he or she objects to the delay by making a written demand for trial or an
>
> oral demand for trial on the record." 725 ILCS 5/103-5(a) (West 2022).

¶ 54    Although the State has the duty to bring defendant to trial, defendant must establish a

statutory speedy trial violation by showing that the delay was not attributable to him. *People v.*

*Kliner*, 185 Ill. 2d 81, 114 (1998). "[D]efense counsel's express agreement to a continuance may

be considered an affirmative act contributing to a delay which is attributable to the defendant." *Id*.

Any period of delay attributable to defendant "temporarily suspends the running of the speedy-

---

[1]    Defendant's brief stated that he was arrested on March 12, 2020. The record indicates, however, that
defendant was arrested on March 10, 2020.

trial period until the expiration of the delay, at which point the statute shall recommence to run." *Id*. In reviewing a statutory speedy trial claim, we will uphold the trial court's determination as to who is responsible for the delay, absent an abuse of discretion. However, we review *de novo* the ultimate question of whether defendant's statutory right to a speedy trial was violated. *People v. Ballard*, 2022 IL App (1st) 210762, ¶ 22.

¶ 55 Defendant remained in custody without a trial for approximately 860 days, well beyond the 120-day limit provided by section 103-5(a). However, on March 20, 2020, ten days after defendant's arrest, our supreme court issued an administrative order authorizing the chief judge of each circuit to continue trials for 60 days due to the COVID-19 outbreak. See *In re Commitment of Sewell*, 2023 IL App (1st) 220168, ¶ 31. The order noted that any delays resulting from this continuance would be excluded from calculations under the speedy trial statute. Chief Judge Evans of the Cook County circuit court continued all matters to May 31, 2020, and then to March 23, 2021. See *Ballard*, 2022 IL App (1st) 210762, ¶ 36. In June 2021, our supreme court modified its order to provide that speedy trial calculations would no longer be tolled beginning October 1, 2021. See Ill. S. Ct., M.R. 30370 (June 30, 2021). The order provided that any days prior to March 20, 2020, and days beginning on and after October 1, 2021, must be included in speedy trial calculations. See *Ballard*, 2022 IL App (1st) 210762, ¶ 37. *Ballard* found that the administrative orders addressing the pandemic were constitutionally valid and held that any trial delays during the relevant period did not count toward the speedy trial term. *Id*. ¶ 38.

¶ 56 Here, defendant was in custody for 10 days prior to March 20, 2020, and those days are included in his speedy trial calculation. On September 2, 2021, he made a demand for trial. At the time, the supreme court's order providing that speedy trial calculations would be tolled up to October 1, 2021, was in effect. The record indicates that the parties continued the matter by

agreement to September 28, 2021. The case was again continued by agreement to October 14, 2021. Defendant demanded trial on that date and on October 19, 2021, the case was continued by agreement to October 25, 2021. The record indicates that the matter was thereafter continued by agreement until defendant's trial commenced on July 18, 2022. "An agreed continuance tolls the speedy trial period, whether or not the case has been set for trial." *People v. Wade*, 2013 IL App (1st) 112547, ¶ 26. Thus, there were five days, from October 14 to October 19, 2021, included in defendant's speedy trial calculations. See *People v. Bivins*, 97 Ill. App. 3d 386, 392 (1981) (finding that the number of days for purposes of speedy trial calculations "is computed by excluding the first day of the period and including the last").

¶ 57    Due to the COVID-19 pandemic, our supreme court's resulting orders excluding days beginning on March 20, 2020 up to October 1, 2021 from speedy trial calculations, and defendant's agreement to continuances, 15 days counted toward the statutory speedy trial term. Since this delay did not exceed the 120-day statutory limit, we find no violation of the speedy trial provision.

¶ 58    Defendant also contends that his constitutional right to a speedy trial was violated where the State did not bring him to trial within one year of his arrest. See *People v. Crane*, 195 Ill. 2d 42, 52-53 (2001) (recognizing a delay of one year to be presumptively prejudicial). The constitutional right to a speedy trial, however, differs from other constitutional protections in that abridgment of the right may at times be advantageous to a defendant. *Id*. at 46-47. As such, deprivation of the right does not *per se* prejudice a defendant's ability to defend himself. *Id*. at 47. Whether a defendant's constitutional right to a speedy trial was violated thus requires a " 'functional analysis of the right in the particular context of the case.' " *Id*. quoting *Barker v. Wingo*, 407 U.S. 514, 515 (1972).

¶ 59    Citing *Barker*, our supreme court identified four factors to consider: 1) the length of the delay, 2) the reasons for the delay, 3) the prejudice, if any, to defendant, and 4) defendant's assertion of his right. *Id*. at 48. Regarding the length of the delay, *Crane* found that a delay approaching one year is "presumptively prejudicial," or unreasonable enough to require an inquiry. *Id*. at 52-53. In the case before us, defendant's trial took place more than two years after his arrest. Although the delay is presumptively prejudicial under *Crane*, that does not mean defendant's constitutional right to a speedy trial was violated. Rather, the one year limit marks the point at which the delay is deemed unreasonable enough to trigger an inquiry. *Id*. at 53.

¶ 60    Since defendant's delay is sufficient to trigger the *Barker*/*Crane* analysis, we next consider the reason for the delay. *Id*. While faulty police procedure or negligence may be charged against the State, other reasons, such as the inability to locate a competent witness or a judge's illness, are valid explanations justifying a reasonable delay. *Id*. at 53-54. Defendant, however, provides no argument regarding the reasons for the delay, nor does he argue that he was prejudiced by the delay. He merely concludes that because he was not brought to trial within one year of his arrest, his constitutional right to a speedy trial was violated. His conclusory statement, without supporting analysis, does not satisfy Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020), which requires defendant to provide his contentions and the "reasons therefor." These rules have the force of law and courts must enforce them as written. *People v. Houston*, 226 Ill. 2d 135, 152 (2007).

¶ 61    Furthermore, the record shows that much of the delay was attributed to our supreme court's orders in response to the COVID-19 pandemic. Our court has found that "neither the State nor the defendant is responsible for the delay in proceeding to trial in the face of the public safety concerns created by the COVID-19 pandemic, as such delays are unavoidable." *People v. Johnson*, 2023 IL App (4th) 210662, ¶ 62. Other jurisdictions have determined that the pandemic was "an external

global emergency" similar to large-scale public emergencies such as the eruption of Mt. St. Helens and the September 11, 2001 terrorist attacks. See *State v. Paige*, 977 N.W.2d 829, 840 (S. Ct. of Minn. 2022). Such events supported a suspension of jury trials without violating a defendant's right to a speedy trial. *Id*. See also *State v. Tuinman*, 535 P.3d 362, 380 (Ct. of App. Utah 2023) (finding that "delays associated with a once-in-a-century pandemic should not in fairness be held against the State"). Accordingly, we hold that defendant's constitutional right to a speedy trial was not violated.

¶ 62                                B. *Insufficient Indictment*

¶ 63    Defendant next contends that the indictment did not sufficiently inform him of the charges against him. Defendant has a fundamental right, as set forth in section 111-3 of the Code (725 ILCS 5/111-3 (West 2022)), to be informed of the criminal accusations made against him. *People v. Rowell*, 229 Ill. 2d 82, 92–93 (2008). Section 111-3 states:

"(a) A charge shall be in writing and allege the commission of an offense by:

(1) Stating the name of the offense;

(2) Citing the statutory provision alleged to have been violated;

(3) Setting forth the nature and elements of the offense charged;

(4) Stating the date and county of the offense as definitely as can be done; and

(5) Stating the name of the accused, if known, and if not known, designate the accused by any name or description by which he can be identified with reasonable certainty.

(a-5) If the victim is alleged to have been subjected to an offense involving an illegal sexual act including, but not limited to, a sexual offense defined in Article 11 or Section 10-9 of the Criminal Code of 2012, the charge shall state the identity of the victim by name, initials, or description." 725 ILCS 5/111-3(a) (West 2022).

¶ 64 Defendant argues that the indictment charging him was insufficient where it failed to specify the dates of the alleged offenses. Instead, the indictment provided a time frame of August 1, 2019 to March 5, 2020. The sufficiency of an indictment is reviewed *de novo*. *People v. Guerrero*, 356 Ill. App. 3d 22, 26 (2005).

¶ 65 Section 111-3(a) does not require the State to prove the precise date on which the offenses occurred. *Id*. at 27. Especially if the case involves the sexual abuse of a child, flexibility is permitted regarding the date requirement under the Code. *Id*. "As long as the crime occurred within the statute of limitations and prior to the return of the charging instrument, the State need only provide the defendant with the best information it has as to when the offenses occurred." *Id*. citing *People v Burton*, 201 Ill. App. 3d 116, 123 (1990). Defendant does not argue that the offenses occurred outside of the statute of limitations, or after the return of the charging instrument.

¶ 66 Although defendant complains of the approximately seven-month time frame in the indictment, courts have found that indictments with similar or longer time frames sufficiently apprised the defendants of the allegations against them. See *People v. Harris*, 187 Ill. App. 3d 832, 843 (1989) (finding the indictment charging the defendant with sexual abuse of a seven-year old was sufficient by providing a six-month time frame for the alleged offenses), abrogated on other grounds by *People v. Fern*, 189 Ill. 2d 48 (1999); *Burton*, 201 Ill. App. 3d at 122–23 (upholding an indictment that charged defendant with the sexual abuse of two girls under 13 years of age that spanned over 33 months); *Guerrero*, 356 Ill. App. 3d at 27-28 (finding that the three-year period identified in the indictment as when the abuse occurred, beginning when the child was six years old, was "as definite as possible" given the victim's young age and the fact that the abuse occurred over a three-year period).

¶ 67    Furthermore, defendant challenged the indictment for the first time in a posttrial motion. When an indictment or information is attacked for the first time posttrial, defendant must show that the insufficiency prejudiced him in the preparation of his defense. *People v. Rowell*, 229 Ill. 2d 82, 93 (2008). Defendant does not argue that the alleged insufficiency in the indictment prejudiced him. For these reasons, we find that the indictment was proper.

¶ 68                            C. *Sufficiency of the Evidence*

¶ 69    Defendant next contends that the State failed to prove him guilty of all charges beyond a reasonable doubt. Defendant was convicted of two counts of predatory criminal sexual assault, one count of aggravated criminal sexual abuse and one count of aggravated domestic battery. He argues that reasonable doubt exists regarding his sexual assault and abuse convictions where no objective physical evidence of sexual interaction between defendant and N.G. was presented at trial, and N.G.'s testimony was not credible.

¶ 70    Defendant, however, has not cited any authority supporting these arguments. The appellate court is not a depository into which an appellant may dump the burden of research and argument. *People v. Oglesby*, 2016 IL App (1st) 141477, ¶ 205. Supreme Court Rule 341(h)(7) requires appellants to include "[a]rgument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." Ill. S. Ct. R. 341(h)(7) (eff. Oct 1, 2020). Contentions supported by some argument, but no authority, do not meet the requirements of Rule 341(h)(7) and thus are forfeited on review. *People v. Macias*, 2015 IL App (1st) 132039, ¶ 112.

¶ 71    Regardless of forfeiture, we will not overturn a conviction unless the evidence is "so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of defendant's guilt." *People v. Wheeler*, 226 Ill. 2d 92, 115 (2007). When a defendant challenges the sufficiency

of the evidence, a reviewing court considers whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id*. at 114. In making this determination, we view the evidence in the light most favorable to the State. *People v. Collins*, 106 Ill. 2d 237, 261 (1985); *Wheeler*, 226 Ill. 2d at 115. Additionally, the trier of fact is responsible for determining witness credibility and the weight given to their testimony, resolving conflicts in the evidence, and drawing reasonable inferences from the evidence. *People v. Brooks*, 187 Ill. 2d 91, 132 (1999). Therefore, a reviewing court will not substitute its judgment for that of the trier of fact on these matters. *Id*.

¶ 72    It is well-established that Illinois law does not require corroboration of a sexual assault victim's testimony through physical or medical evidence in order to sustain a conviction. See *People v. Le*, 346 Ill. App. 3d 41, 50 (2004). Defendant also contends that N.G.'s testimony was not credible because she could not remember exactly when defendant's penis touched "the part where she pees," or whether it was a school day. "A witness's inability to remember exact dates and times, by itself, does not create reasonable doubt." *People v. Nevilles*, 2021 IL App (1st) 191388, ¶ 59. It affects only the weight of her testimony. *Id*.

¶ 73    To sustain a conviction for sexual abuse, the victim's testimony need not be unimpeached, uncontradicted or crystal clear. *People v. Garcia*, 2012 IL App (1st) 103590, ¶ 84. Where minor inadequacies do not detract from the reasonableness of the testimony as a whole, the testimony can support a conviction for sexual abuse. *People v. Soler*, 228 Ill. App. 3d 183, 200 (1992). Despite her inability to provide specific details on every sexual encounter with defendant, N.G. testified consistently and without impeachment that on multiple occasions, defendant engaged in sexual conduct with her. N.G. also told her mother that defendant "had his penis inside her vagina."

¶ 74    Defendant further argues that there was no evidence he strangled N.G., the basis of his aggravated domestic battery conviction. Defendant argues that "strangle" is defined in section 12-3.3(a-5) of the Code as " 'intentionally impeding the normal breathing or circulation of the blood of an individual by applying pressure on the throat or neck of that individual[.]' " 720 ILCS 5/12-3.3(a-5) (West 2022). He contends there was no evidence that he put his hands around N.G.'s neck or throat.

¶ 75    Defendant neglects to include, however, the remaining portion of that provision. Section 12-3.3(a-5) defines "strangle" as "intentionally impeding the normal breathing or circulation of the blood of an individual by applying pressure on the throat or neck of that individual *or by blocking the nose or mouth of that individual*." (Emphasis added.) *Id*. N.G. testified that defendant intentionally pushed her head into a pillow because she was "being too loud." She testified that she could not breathe. N.G.'s testimony alone was sufficient to establish the elements of the offense. *People v. Kitch*, 239 Ill. 2d 452, 463–64 (2011).

¶ 76    Defendant's final contention on the sufficiency issue is that there was no evidence to support the trial court's finding that N.G. was "exposed to things that should never have been seen or known about." Defendant does not explain how this alleged error factors into the reasonable doubt analysis. To the extent that it addresses the credibility of N.G. as a witness, we reiterate that we will not substitute our judgment for that of the fact finder regarding witness credibility. It was reasonable for the trial court to conclude that a ten-year-old child would not normally know of acts such as defendant grabbing the "pink lotion" and putting the lotion on "[t]he part where he pees with," and then inserting that part into N.G.'s anus, or that there was a squeaking noise while defendant moved when he and N.G. were on the bed.

¶ 77 Viewing the evidence in the light most favorable to the State, a rational trier of fact could find the essential elements of the offenses beyond a reasonable doubt.

¶ 78                                   D. *Errors in Admitting Evidence*

¶ 79 Defendant next contends that various trial errors denied him a fair trial.

¶ 80 First, he argues that the trial court committed reversible error when it allowed Mora to testify about finding N.G.'s underwear in her bedroom, where the statement was disclosed to defense counsel less than a week before trial began. We review the trial court's admission of testimony for an abuse of discretion. *People v. Tolliver*, 347 Ill. App. 3d 203, 222 (2004).

¶ 81 Defendant does not argue why this constitutes error, but merely concludes that his right to a fair trial was violated. Even if the trial court had erred in allowing the statement, defendant must show that he was surprised or prejudiced by the discovery violation. *People v. Harris*, 123 Ill. 2d 113, 151-52 (1988). Where defendant was accorded ample opportunity to cross-examine witnesses on the statement, he was not prejudiced by the error. *Id.* at 152. Although defense counsel extensively cross-examined Mora and N.G. on their statements and specific allegations, he never questioned them about this particular statement. We fail to see how admission of the statement prejudiced defendant when he had ample opportunity to cross-examine both witnesses regarding the statement but chose not to do so. The trial court did not abuse its discretion by allowing the statement.

¶ 82 Second, defendant alleges that the prosecutor's rebuttal closing argument improperly vouched for N.G.'s credibility when she remarked that "There's no way [N.G.] could make this up." The prosecutor also mischaracterized the evidence by stating that N.G. was scared to tell her teachers about the abuse, and defendant "was the only real father figure" in her life.

¶ 83    We initially address the State's contention that defendant forfeited review of these statements where he failed to object to the prosecutor's arguments. "To preserve claimed improper statements during closing argument for review, a defendant must object to the offending statements both at trial and in a written posttrial motion." *Wheeler*, 226 Ill. 2d at 122. Defendant included this issue in a posttrial motion, but he did not object to the remarks at trial. Therefore, he has forfeited review of this issue.

¶ 84    Even if defendant had preserved this error, the trial court in a bench trial is presumed to consider only competent evidence when making a finding. *People v. Simac*, 161 Ill. 2d 297, 311 (1994). Furthermore, the prosecutor made these remarks in rebuttal. In closing, defense counsel repeatedly argued that N.G. was not a credible witness and her testimony should not be believed. He also implied that N.G.'s allegations were not credible because she did not "mak[e] an outcry to anybody or anywhere" before March 5, 2020. The prosecutor may respond to defense counsel's arguments which clearly invite a response. *People v. Kliner*, 185 Ill. 2d 81, 154 (1998). Moreover, reversal is warranted only if the remarks caused such substantial prejudice to defendant that "it is impossible to say whether or not a verdict of guilt resulted from them." *Id*. at 123. Defendant makes no argument as to how these statements prejudiced him, other than the fact that the trial court found N.G. to be a credible witness. As such, we find this contention to be without merit.

¶ 85    Third, defendant contends that the stipulation regarding Stephanie Tuetli's testimony violated his constitutional right to confront witnesses. The parties stipulated that if called as a witness, Tuetli would testify that she interviewed N.G. on March 6, 2020, and the interview was recorded. She would identify People's Exhibit 11 as a true and accurate depiction of the interview. Defendant argues that the recording improperly bolstered N.G.'s testimony with no opportunity for cross-examination. As support, defendant cites *Crawford v. Washington*, 541 U.S. 36, 124

(2004), *People v. Sisavath*, 118 Cal.App.4th 1396 (2004), and *Snowden v. State*, 156 Md.App. 139 (2004).

¶ 86    All of these cases involved hearsay statements presented through testimony. In this case, the evidence was presented by stipulation of the parties. The general rule is that "defense counsel may validly waive a defendant's right of confrontation [through stipulation] where two elements are met: (1) the defendant does not object to the stipulation; and (2) the decision to stipulate is a matter of trial tactics and strategy." *People v. Clendenin*, 238 Ill. 2d 302, 324 (2010). Here, defendant agreed to the stipulation of Teutli's testimony, and he makes no argument as to whether the decision to stipulate was a matter of trial strategy. Therefore, he has waived any challenge to Teutli's testimony presented by way of the stipulation.

¶ 87    Moreover, defendant did not object to the admission of the recording of Teutli's interview with N.G. When a party acquiesces to an evidentiary ruling, even if the ruling is improper, that party cannot complain of the ruling on appeal. *People v. Bush*, 214 Ill. 2d 318, 332 (2005). We find no error here.

¶ 88                              E. *Excessive Sentence*

¶ 89    Defendant's final contention is that the trial court abused its discretion when it sentenced him to 32 years in prison. We note that Defendant did not file a motion to reconsider his sentence, nor did he object when the trial court imposed his sentence. "It is well settled that, to preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required." *People v. Hillier*, 237 Ill. 2d 539, 544-45 (2010). Although we may review the issue as plain error, defendant does not argue for plain-error review. "A defendant who fails to argue for plain-error review obviously cannot meet his burden of persuasion." *Id*. As such, we must "honor defendant's procedural default." *Id*. at 547.

¶ 90    Furthermore, defendant makes no argument that his sentence was not authorized by statute and is therefore void. In any event, we would find no merit to this argument where his 32-year sentence was well within the statutory range for his offenses. See 720 ILCS 5/11-1.40(b)(1) (West 2022) (predatory criminal sexual assault of a child is a Class X felony with a sentencing range of 6 to 60 years); 720 ILCS 5/11-1.60(b) (West 2022) (aggravated criminal sexual abuse is a Class 2 felony with a sentencing range of 3 to 7 years); 720 ILCS 5/12-3.3(a-5) (West 2022) (aggravated domestic battery is a Class 2 felony with a sentencing range of 3 to 7 years). Accordingly, we find that defendant received an authorized sentence. See *Hillier*, 237 Ill. 2d at 547.

¶ 91                                    III. CONCLUSION

¶ 92    For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 93    Affirmed.